### In re OAKS PARTNERS, LTD., a Georgia Limited Partnership, Debtor.

### Bankruptcy No. 89–00948.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Feb. 20, 1992.

Order Of Confirmation March 6, 1992.

Mark S. Kaufman, J. James Johnson, Long, Aldridge & Norman, Atlanta, Ga., for debtor.

C. Richard McQueen, Greene, Buckley, Jones & McQueen, Atlanta, Ga., Alan R. Lepene, Thompson, Hine & Flory, Cleveland, Ohio, for creditor/competing plan proponent.

ORDER

JOYCE BIHARY, Bankruptcy Judge.

I. *Introduction*

This matter is before the Court on two competing plans, Debtor's Plan of Reorganization as amended ("Debtor's Plan"), and the Plan of Liquidation proposed by First Union Real Estate Equity and Mortgage Investments as amended ("First Union's Plan"). First Union filed objections to Debtor's Plan, and debtor Oaks Partners, Ltd. ("Oaks"), filed objections to First Union's Plan. The hearing to consider confirmation of the plans commenced on October 21, 1991, and counsel for Oaks and First

Union presented evidence and legal argument.

On December 9, 1991, the Court entered an Order concerning certain key issues raised by First Union's objections to the confirmation of Debtor's Plan. *In re Oaks Partners, Ltd.*, 135 BR 440, 22 B.C.D. 673 (Bankr.N.D.Ga.1991). These issues included the appropriate cramdown rate of interest, the value of debtor's property serving as First Union's collateral, and the application of post-petition payments made by debtor to First Union during the pendency of this Chapter 11 case. At the conclusion of the December 9, 1991 Order, the Court directed the parties to appear on January 8, 1992 and advise the Court which factual and legal issues remained to be adjudicated in order to determine which plan should be confirmed.

On January 8, 1992, debtor filed its Second Modification to Debtor's Plan to provide that interest on the unpaid amount of First Union's claim would accrue at the rate of 10 ¼% per annum or such other rate as the Court may designate in a confirmation order as being appropriate for purposes of cramdown under the Bankruptcy Code.

At the January 8, 1992 hearing, counsel advised the Court that the significant remaining issues involved First Union's objections to debtor's classification of claims and to the negative amortization feature in Debtor's Plan. After hearing considerable argument with respect to the classification issues, the Court provided the parties with direction, suggesting that First Union's objections based on classification could be met by minor amendments to Debtor's Plan. Those amendments have been made and will be discussed herein. Unfortunately, the factual presentation regarding the negative amortization feature of Debtor's Plan was not sufficiently clear for the Court to make any meaningful findings or rulings. Debtor had prepared some exhibits showing projected negative amortization, but had not shared them with First Union's counsel prior to the hearing. In addition, the Court advised counsel that the amount of negative amortization proposed

was unreasonably high. The Court gave debtor time in which to amend Debtor's Plan to eliminate or reduce the amount of negative amortization and to file a memorandum explaining clearly the proposed amount of deferred interest, by year, at the interest rates under consideration. The Court gave both debtor and First Union time to file briefs on the appropriateness of the amount of the negative amortization under any amended plan. Debtor and First Union have filed amendments, and the parties have filed briefs. Thus, the case is now in a posture to rule on the remaining objections to the two plans.

Having considered Debtor's Plan and First Union's Plan, the evidence and arguments presented, the effect of the Court's rulings in the December 9, 1991 Order, and the post-hearing amendments and submissions of counsel, the Court finds that neither plan as modified yet satisfies the requirements for confirmation under the Bankruptcy Code. Both plan proponents will be given a brief period in which to amend their respective plans, if they so choose.

## II. *The Debtor's Plan*

Most of the pertinent background facts including a description of the debtor and a description of Debtor's Plan are set out in the December 9, 1991 Order, and those facts will not be repeated here. On January 14, 1992, debtor filed a Third Modification of its Plan which: (i) increased the effective pay rate of interest on First Union's claim from 9.32% to 9.85%; (ii) eliminated debtor's obligation to pay an insider a fee of 1% of gross income for administrative services; (iii) eliminated the requirement in the plan to establish and maintain a reserve fund of $70,000.00 designed to cover emergency expenses; and (iv) increased the minimum amount that must be raised from limited partners to $600,000.00 from $450,000.00.

### A. Objection to Negative Amortization

The significant remaining objection to Debtor's Plan is to the negative amortiza-tion feature. "Negative amortization" refers to the amount of deferred interest on the claim of First Union under Debtor's Plan. Debtor's Plan as now modified provides that First Union will be paid at the rate of 9.85%, while interest will accrue at the rate of 10.25% per annum or at such other rate as the Court may designate. While the parties have suggested that daily fluctuations in reported yields on treasury obligations might change the appropriate cramdown interest rate, for all the reasons given in the December 9, 1991 Order and considering the published yield from December 9, 1991 to today's date on a treasury bond maturing in August, 2000, the Court still finds that 10¼% is the appropriate cramdown interest rate.[1] The effect of debtor's modifications is that there will be approximately $302,000.00 of deferred interest on First Union's claim during the first seven years under Debtor's Plan, and the deferred interest will not be fully paid until the end of the plan term in June, 2000. First Union objects and argues that this negative amortization feature of Debtor's Plan is not fair and equitable under 11 U.S.C. § 1129(b).

To put this discussion into focus, it is useful to remember that First Union has not accepted Debtor's Plan and is impaired under Debtor's Plan. Thus, debtor has requested that its plan be confirmed under the "cramdown" provisions in § 1129(b) of the Bankruptcy Code. Under § 1129(b)(1), a plan can be confirmed notwithstanding the impairment of and nonacceptance by a class of claims, if the plan does not discriminate unfairly and if it is fair and equitable with respect to such class of claims. Accordingly, the Court cannot confirm Debtor's Plan without a finding that the plan is fair and equitable with respect to First Union.

The recent Ninth Circuit case of *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174 (9th Cir.1992) summarizes the current state of the law regarding whether a plan that includes negative amortization is fair and equitable with-

---

**1.** In considering the yields on treasury bonds, the Court has taken judicial notice of the pub-lished yields as set forth in the Wall Street Journal pursuant to Fed.R.Evid. 201.

in the meaning of § 1129(b). The Court in *Sierra Woods* surveyed most, if not all, of the reported Chapter 11 cases on the subject and noted that certain patterns have emerged. First, all but one of the courts which have considered the issue have rejected a *per se* rule against negative amortization and have determined that compliance with the fair and equitable requirement must be decided on a case-by-case basis. Second, the courts have most often determined, after analyzing the particular facts of the case, that the negative amortization was not fair and equitable under the circumstances. The Ninth Circuit concluded that the fairness of a reorganization plan that includes negative amortization should be determined on a case-by-case basis and reversed the decisions below which involved, among other things, the conclusion that negative amortization was *per se* impermissible. This Court agrees with the Ninth Circuit and concludes that it cannot reject Debtor's Plan out of hand, because it contains some deferral of interest. However, the plan has to be scrutinized carefully.

The recent decision of *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr. W.D.Tenn.1991) sets forth the following list of ten factors [2] relevant to the determination of whether the use of negative amortization is fair and equitable in a particular case.

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

With regard to the first factor, the Court concludes that Debtor's Plan offers a market rate of interest (the cramdown rate), and the present value of the deferred payments is equal to the amount of First Union's claim. This is not surprising, since debtor amended its plan to provide for the accrual of interest at whatever rate the Court determined appropriate for cramdown under § 1129(b) of the Bankruptcy Code.

The issue posed by the second factor—whether the amount and length of the proposed interest deferral is reasonable—is more difficult to answer. There are no useful appellate guidelines for bankruptcy courts to follow in considering whether a particular amount is reasonable or unreasonable. Debtor argues that the amount of deferred interest is small in comparison to the total loan amount. The total amount of deferred interest will be $301,946.00 which is about 2.5% of First Union's $12,-036,200.00 claim. First Union argues that $301,946.00 is a substantial sum of money and that requiring First Union to in effect increase its financing on this project by $301,946.00 is not fair. First Union also argues that seven years, the length of time over which interest is deferred, is not reasonable. The interest is not fully paid until the end of the plan which is about 8½ years. The Court finds that this factor weighs in First Union's favor. While the amount of the interest deferral is now much lower than debtor's proposal on January 8, 1992 to defer interest in the amount of $893,698.00, the amount and length of time proposed now are still not reasonable.

The third and fifth numbered factors are interrelated and depend on the perceived

---

**2.** The frequently cited case of *In re Spanish Lake Assoc.*, 92 B.R. 875, 878 (Bankr.E.D.Mo.1988) contains a shorter list of factors, all of which are included in the *Apple Tree* factors.

worth of the collateral securing the creditor's claim. These factors consider the ratio of the debt to the collateral value during the term of the plan, and the nature of the collateral, including whether it is appreciating, depreciating, or relatively stable in value.

In this case, after applying debtor's postpetition payments to satisfy First Union's unsecured claim, the remaining balance of the claim will be equal to the value of the collateral, $12,036,200.00. Thus, there is an initial debt-to-value ratio of 100%. Debtor argues that the evidence indicates that this ratio will decrease during the Plan's term notwithstanding any projected negative amortization, due to the property's anticipated appreciation in value. While the property is well managed and now has a high occupancy rate, a finding that the property will increase in value during the period of negative amortization depends on a finding that certain capital improvements will be made. Roofing, exterior painting, and other extraordinary improvements have been budgeted by debtor to occur in Year 1 ($275,000.00), Year 2 ($175,000.00), and Year 3 ($28,575.00). The Court agrees with debtor that it is reasonable to conclude that these property improvements, reflecting an aggregate expenditure of more than $475,000.00, will improve the collateral value by an amount greater than the amount of deferred interest on First Union's claim. However, First Union points out that debtor has no obligation under the plan to make the capital improvements. First Union further argues that debtor's cash position, using debtor's own projections, are now very tight and that if debtor finds itself short of cash, it may defer capital improvements, as it has done in the past, in order to allow debtor to cover the minimum debt service to First Union and avoid default under the plan. If First Union is correct, there is a possibility that the improvements will not be made, and First Union could find itself with collateral that is not appreciating.

The fourth factor involves the feasibility of Debtor's Plan and the reasonableness of debtor's financial projections. The Court found as a part of the December 9, 1991 Order that debtor's feasibility analysis and projections appeared reasonable. First Union argues that the modifications in Debtor's Plan after December 9, 1991 which call for larger monthly payments to First Union render the plan infeasible, increase the risk of default and make it likely that debtor will not have money available to make the budgeted repairs to the property.

After carefully reviewing the evidence and the arguments by counsel, the Court still concludes that the plan is feasible within the meaning of § 1129(a)(11). This feasibility requirement does not involve a guaranty or a certainty, but a finding of reasonable probability of actual performance of the plan. Nonetheless, First Union is correct that the feasibility of Debtor's Plan has been affected by the recent modifications. Under the original projections presented to the Court at the confirmation hearing, debtor projected a cash shortfall from operations during the first two years of the plan of $235,278.00. This projected cash shortfall was to be covered by the $450,000.00 to be raised from the limited partners, leaving a cushion of approximately $215,000.00. Under Debtor's Plan, as modified, the projected cash shortfall over the first four years of the plan will amount to $531,771.00. Even if debtor is able to raise the $600,000.00 now required, there is only a cushion of $68,229.00. Furthermore, in order to raise the funds necessary to cover the increased cash requirement under Debtor's Plan, debtor has eliminated the reserve fund of $70,000.00 which was designed to provide funds to cover emergency expenses that might arise in the course of operations. The existence of the reserve fund was one of the elements offered by debtor at the confirmation hearing to support the reasonableness of its projections. Given the fact that the property presently is approximately 17 years old and the plan extends for an additional 8½ years, a reserve fund to cover emergency expenditures was warranted. Thus, while the projections on income and expenses have not changed and are reasonable, the larger monthly payments under the plan and the reduction of a cushion affect the feasibility

of the plan. Simply put, the numbers here are very close and there is less room for error.

The sixth factor—whether the risks are unduly shifted to First Union—focuses on the fairness of the risks borne by the secured creditor who objects to having the interest payments deferred. The Court arrived at 10¼% as the fair cramdown interest rate, after carefully evaluating the risks involved in the plan. Debtor's proposal to defer a portion of that interest payment shifts additional risks to First Union. In view of all that has been discussed above, the Court finds that deferring a part of the 10¼% interest payment due First Union results in an undue shifting of risk to First Union. If the property needs another $302,000.00 in equity or debt, then it makes far greater sense for the owners to contribute the funds than for the Court to force First Union to in effect make an additional loan over its strenuous objection.

The seventh factor is whether the risks are borne by one secured creditor or a class of secured creditors. Here, the risks are borne by a single creditor.

The eighth and tenth factors involve whether the plan permits foreclosure and whether there are adequate safeguards to protect the creditor against plan failure. Thus, it is necessary to analyze what remedies exist for First Union in Debtor's Plan if (1) debtor does not raise the $600,000.00; (2) debtor does not make the monthly payments; and (3) debtor does not make the necessary repairs.

Debtor's Plan permits foreclosure if debtor misses a plan payment to First Union,[3] but the foreclosure remedy is not available if debtor does not make the expected repairs. First Union argues that debtor is not required under its plan to make the necessary repairs and that First

Union has no safeguard here. In fact, Debtor's Plan does not obligate debtor to perform repairs, despite testimony and statements that debtor expects to repair the roofs, perform exterior painting and make other improvements in the amount of some $475,000.00 during the first three years of the plan.[4] Although debtor has budgeted significant sums for repairs, First Union is correct that Debtor's Plan does not provide First Union with the remedy of foreclosure or any other remedy if debtor does not make the repairs discussed at the confirmation hearing.

Finally, Debtor's Plan does not permit foreclosure if debtor fails to raise the $600,000.00. As a part of this protracted Chapter 11 case, debtor filed an adversary proceeding challenging First Union's rights to a claim at all based on the manner by which First Union came to hold the Wrap Note[5]. The Court has tried to understand the mechanics of Debtor's Plan in connection with First Union's right to foreclose and the adversary proceeding litigation. Initially, the Court understood from statements by counsel that upon confirmation of Debtor's Plan, debtor would dismiss the adversary proceeding with prejudice, thus allowing First Union to foreclose should debtor default or should any condition of confirmation not occur. Debtor's counsel suggested that First Union would be free to pursue any and all remedies should debtor fail to raise the $600,000.00 required in its Plan. During the confirmation hearing, counsel for debtor stated that "[t]his plan doesn't leave us with no resolution point if we can't raise the monies. Feasible means, not likely to require further reorganization, or be in Chapter 7. It will be a neither, because there is going to be a lift stay and a foreclosure if we don't raise the monies." Transcript of Confirmation Hearing held on October 25, 1991, at 78, lines 7–12. How-

---

**3.** Debtor's Plan provides that in the event of a default, as defined in ¶ 13.01(a) of Debtor's Plan, First Union can accelerate the entire amount then due and pursue all of its remedies, including the remedy of foreclosure.

**4.** *See* Debtor's Post–Hearing Br. Concerning Negative Amortization under the Debtor's Plan filed on January 22, at 1, 9, and 16–17.

**5.** The adversary proceeding is styled *Oaks Partners, Ltd. v. Consolidated Capital Realty Investors*, Adversary No. 89–0266, and the term "Wrap Note" is fully described on page 2 of the Court's December 9, 1991 Order.

ever, at the continued confirmation hearing, when debtor's lead counsel asserted that "those [the adversary proceeding and other issues] go away if we are confirmed," co-counsel interjected "[a]s of the effective date." Transcript of Continued Confirmation Hearing held on January 8, 1992, at 18, lines 19–20. The Court has examined Debtor's Plan, and notes that the plan by its terms does not require dismissal of the adversary proceeding upon confirmation. On page 25 of the Plan, § 5.02(1) calls for the dismissal of the adversary proceeding on the Effective Date. "Effective Date" is defined on page 5 in § 1.09 of the plan to occur after debtor receives the cash and notes from investors described in Article III. The plan provides on page 16 that if debtor is unsuccessful in raising the necessary funds from partners, the "Effective Date does not occur." Thus, while the plan does not say straight out that if debtor fails to raise the funds, First Union still cannot foreclose without further litigation in the bankruptcy court, it appears that this is exactly what the plan provides.

■ The ninth factor is whether the original loan terms provided for negative amortization. The parties do not dispute that the original loan terms here provided for negative amortization. Debtor argues that since the original loan contained a negative amortization feature, there is nothing unfair about requiring First Union to accept a deferral of interest once again in a new, extended forced Chapter 11 loan. First Union urges the Court to hold that this factor is irrelevant and should not be considered. This factor is of some relevance to the overall analysis, but the existence of the provision in the original consensual loan does not justify the inclusion of the provision in the forced context of a cramdown Chapter 11 plan, when the other factors weigh in the secured creditor's favor.

Finally, debtor argues that the negative amortization here is fair, when one considers how First Union came to hold the Wrap Note. The Wrap Note was originally held by Consolidated Capital Realty Investors ("CCRI"). First Union made a loan of $5,750,000.00 to CCRI and by virtue of CCRI's default, First Union now holds a claim in this proceeding of $12,036,000.00. Debtor argues that when all is said and done, First Union is receiving a substantial yield under Debtor's Plan, based on the amount First Union actually invested in order to obtain the claim. Debtor has not cited any authority that would allow the Court to consider these facts, and the Court is persuaded that First Union's rights under the Wrap Note are not affected by the amount it invested to acquire the claim. *See In re Executive Office Centers, Inc.*, 96 B.R. 642 (Bankr.E.D.La.1988).

In summary, Debtor's Plan still contains a substantial amount of negative amortization. While the recent modifications do not render the plan infeasible, they affect feasibility. The plan does not give First Union the right to foreclose if the repairs are not made, nor does it give First Union the right to foreclose if debtor is unable to raise the $600,000.00. Weighing all the factors, the Court cannot find that Debtor's Plan with this set of features is fair and equitable under § 1129(b).

### B.   Objections to Classification

■ First Union's objections based on debtor's classifications are overruled or moot. First Union objected that the separate classification of its unsecured claim in Class 4 under Debtor's Plan was impermissible. Under Debtor's Plan, and in light of the Court's rulings in the December 9, 1991 Order, First Union's unsecured claim is paid in full as of the effective date by application of post-petition payments. First Union's unsecured claim is thus eliminated or unimpaired, and First Union's objection based on its separate classification is moot.

■ First Union objected that Debtor's Plan impermissibly classified the general unsecured trade claims in Class 5 separately from the unsecured claim of Safeco in Class 8. Class 5 and Class 8 both voted to accept Debtor's Plan. The Third Modification of Debtor's Plan filed on January 14, 1992 provides that the claims in Class 5 and Class 8 are consolidated into a single impaired class and will be treated identically.

Each holder of a claim in this class will be paid in cash 80% of the amount of its claim within 30 days and 20% of its claim within 90 days. This modification moots First Union's objection based on the separation of Class 5 and Class 8, and the Court finds that the classification of claims in Debtor's Plan as now amended complies with the applicable provisions of the Bankruptcy Code.

■ First Union also objected to the treatment of unsecured claims under Debtor's Plan as constituting an artificial and unnecessary impairment in bad faith, in light of debtor's alleged ability to pay the claims in full prior to the effective date rather than over 90 days. First Union's objection would have more force and might render Debtor's Plan unconfirmable, if First Union had an unsecured claim that was subject to separate and discriminatory treatment. However, since First Union's unsecured claim is fully satisfied, First Union suffers no adverse economic impact as a result of the delay in paying other unsecured claims, and the unsecured creditors are not objecting to their treatment, the Court finds that the treatment of the other unsecured claims does not amount to bad faith on the part of debtor.

The Court has examined all of the other objections raised by First Union to Debtor's Plan and those are overruled. The Court finds that Debtor's Plan has been proposed in good faith and not by any means forbidden by law and that Debtor's Plan meets all other requirements for confirmation other than as noted above in the discussion on negative amortization.

### III. *First Union's Liquidation Plan*

First Union's Plan is a liquidation plan. It requires debtor to obtain an executed contract to sell the property within 90 days for a net price of more than $14 million. If debtor fails to do so, the automatic stay is lifted, allowing First Union to foreclose at any price.

Class 1 consists of Mutual Life Insurance Company of New York ("MONY"), the holder of the underlying notes. Under First Union's Plan as modified, MONY is not impaired and has accepted the plan.

Class 2 consists of the claims of First Union. Not surprisingly, First Union has voted to accept its plan and contends it is impaired by the plan. The plan provides that if the debtor sells the property as provided for under the plan, then First Union will be paid in full unless it agrees to take less than full payment. First Union remains subject to the automatic stay during the time the debtor has the opportunity to sell the property.

Class 3 consists of priority and post-petition administrative claims. First Union's Plan provides that these claims will be paid in full on the effective date of the plan from debtor's unencumbered cash account and, if that account is not sufficient to pay post-petition administrative expenses, then First Union will fund any remaining amounts necessary to pay those claims in full. Class 3 is not impaired.

Class 4 consists of pre-petition tax claims, and the parties have indicated that they are not aware of any claims in this class. Nonetheless, First Union's Plan provides that any such claims will be paid in full and thus the class is not impaired.

Class 5 consists of tenants with security deposits and this class is not impaired.

Class 6 is the class of unsecured creditors, excluding claims of debtor's general partners and any entities related to the debtor. First Union's Plan provides that Class 6 claims will be paid in full either from the sale proceeds or, if the sale is not consummated, then First Union will pay these claims in full. This class is not impaired.

First Union has classified Class 7 as a class of debtor's general partners and related entities called I.R.M., Inc. and I.R.G., Inc. This class has rejected First Union's Plan, and the plan as it is currently written does not provide for any payment to these claimants if debtor does not sell the property. This class is impaired.

Class 8 is a class of equity interests, and this class has rejected the plan. This class also will not be paid anything unless the

property sells within 90 days for an amount sufficient to pay all claims.

The parties do not dispute that it is highly unlikely that debtor will be able to sell the property in accordance with the terms set out in First Union's Plan. Thus, the likely result is that First Union will foreclose upon the property, if First Union is successful in the adversary proceeding. If the property is foreclosed upon, claims in Class 1 (MONY's claim), Class 3 (administrative claimants), and Class 6 (unsecured creditors other than those in Class 7), will be paid in full.

While debtor filed a pleading raising a number of objections to First Union's Plan, debtor argued essentially three objections at the confirmation hearing. Debtor's first objection was that First Union had not provided evidence that it has the financial ability to pay the unsecured claims in full as proposed in First Union's Plan. First Union has filed a modification requiring that within three days following the entry of an order of confirmation, First Union will deposit into an interest-bearing account funds necessary and sufficient to pay all allowed unsecured claims in full. The Court finds that this provision for the establishment of an escrow account will resolve debtor's objection on this issue.

Debtor also objected that First Union's Plan is contrary to the provisions in 11 U.S.C. § 362. Debtor argues that the plan is nothing more than an order granting for relief from the stay. The plan offered by First Union is something more than an order granting relief from the stay, because First Union is obligated to pay all administrative claims and all unsecured claims in full. First Union would not be required to pay these claims, if it sought and obtained relief from the automatic stay. Furthermore, First Union's Plan does not automatically allow foreclosure, since First Union recognizes that prior to any foreclosure, it still must prevail in the adversary proceeding. Accordingly, debtor's objection on this ground is overruled.

The third objection or comment raised by debtor has merit. Debtor argues that the Court cannot cramdown a plan with respect to Class 7, because the Court cannot find that First Union's Plan does not discriminate unfairly with respect to Class 7. Under First Union's Plan, unsecured claims in Class 7 receive nothing, while unsecured claims in Class 6 are paid in full. First Union has presented no evidence that this is fair, and the Court cannot find that the requirements of § 1129(b) have been met. The Court notes that in one of First Union's briefs, it suggested that it was willing "if the Court so directs" to modify its plan to pay Class 7 claims in full. First Union's Plan is not confirmable without such a modification.

The Court has examined all of the other objections raised by debtor to First Union's Plan and those are overruled. The Court finds that First Union's Plan has been proposed in good faith and not by any means forbidden by law and that First Union's Plan meets all the requirements for confirmation other than as noted above.

### IV.  *Conclusion*

Both Debtor's Plan and First Union's Plan require further modification in order to meet the requirements of 11 U.S.C. § 1129. The Court is mindful that this case has dragged on, and the Court is as anxious as the parties to confirm one plan or the other. The alternatives to confirming one of the plans are dismissal of the case or conversion to a case under Chapter 7. Neither alternative would be in the interests of unsecured creditors who will receive payment under either plan. Thus, the Court is constrained to allow the parties one more opportunity to amend their plans, with the hope that one or more confirmable plan will be before the Court. Accordingly, both debtor and First Union are given seven (7) days from the entry of this Order to file modifications addressing those features of their current plans which the Court has identified as obstacles to confirmation. The parties are directed to appear on March 5, 1992, at 2:00 P.M., in Courtroom 1705, United States Courthouse, 75 Spring Street, Atlanta, Georgia, to give counsel an opportunity to present brief ar-

gument on the adequacy of any such modifications.

IT IS SO ORDERED.

## ORDER OF CONFIRMATION

This matter is before the Court to consider confirmation of two competing plans: (1) Debtor's Plan of Reorganization originally filed March 15, 1991, as amended ("Debtor's Plan") and (2) the Plan of Liquidation Proposed by First Union Real Estate Equity and Mortgage Investments originally filed on April 24, 1991, as amended ("First Union's Plan"). First Union and debtor have objected to one another's plans. The Court entered orders on December 9, 1991, and on February 20, 1992, addressing the major objections raised by the parties to the confirmation of these plans. In the February 20, 1992 Order, the Court found that neither plan as it was proposed at that time satisfied the requirements for confirmation under the Bankruptcy Code. The Court gave each party seven days in which to file modifications addressing those features of their plans which the Court identified as obstacles to confirmation.

Both debtor and First Union filed modifications on February 27, 1992. The Court scheduled a hearing on March 5, 1992, to give the parties an opportunity to address the adequacy of the modifications.

Debtor's modifications increase the minimum new investment by limited partners by an additional $75,000.00 (bringing the total required new investment to $675,000.00), eliminate the deferral of interest after the fourth year of the plan, and reduce the total amount of deferred interest to approximately $224,000.00. Debtor's modifications also provide for the immediate exercise of remedies by First Union, including foreclosure, if debtor fails to raise the required new investment or fails to improve the property according to debtor's extraordinary improvement budget. To increase further the strength of First Union's remedies, Debtor's Plan now provides a mechanism such that instead of foreclosure, First Union at its option may demand a deed in lieu of foreclosure. It further provides that debtor will not be permitted in the future to delay or avoid First Union's remedies by seeking further reorganization or filing a new bankruptcy petition.

First Union's modifications filed on February 27, 1992 reclassify the claim of IRG, Inc. as a class 6 general unsecured claim and delete class 7, which was a class consisting of claims of debtor's general partners and related entities. First Union's modifications also set a limit on the amount which First Union shall be required to pay class 3 administrative claims.

Having considered Debtor's Plan and First Union's Plan, all of the evidence presented, the arguments of counsel, and the effect of the Court's previous rulings, the Court finds that Debtor's Plan of reorganization satisfies the requirements for confirmation under the Bankruptcy Code and should be confirmed instead of First Union's Plan of liquidation. The Court makes the following additional findings of fact and conclusions of law.

### I. Debtor's Plan

1. In accordance with the Court's December 9, 1991 Order, First Union's allowed claim is $14,360,000.00, and as of the effective date of Debtor's Plan, $2,323,800.00 of the post-petition payments made by debtor are allowed to be applied in partial satisfaction of First Union's claim pursuant to Debtor's Plan. The remaining balance of First Union's claim, $12,036,200.00, constitutes the "modified principal balance" of First Union's claim under Debtor's Plan. By virtue of the application of those post-petition payments, First Union's unsecured claim is paid in full as of the effective date of Debtor's Plan.

2. The rate of interest required for cramdown purposes is 10¼% interest per annum.

3. After carefully considering debtor's modifications filed on February 27, 1992, the Court finds that the negative amortization feature in Debtor's Plan is fair and equitable under 11 U.S.C. § 1129(b). Debtor's modifications have addressed the Court's concerns set forth in the February 20, 1992 Order, and the plan as modified

permits total deferred interest of approximately $224,000.00 over four years. The plan permits no negative amortization after the fourth year. The modifications require debtor to make the necessary expenditures to improve the property and the plan assures that these improvements will be made. Thus, the collateral will appreciate by more than the amount of the deferred interest, and First Union is protected if debtor fails to make the necessary improvements.

Debtor's modifications involve an increase in the required investment by debtor's partners, and First Union has enhanced foreclosure protections in the event of any defaults. The new modifications expressly provide that if debtor fails to raise the required funds and file the required certificate within 60 days after confirmation, then debtor will dismiss the adversary proceeding described in the February 20, 1992 Order with prejudice, and First Union may take the property and/or foreclose. Similarly, debtor's failure to make the required expenditures for property improvements in the first three years of the plan are an event of default, giving rise to First Union's remedies, including foreclosure.

In light of these modifications to the plan, and weighing the factors in *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr.W.D.Tenn.1991), the Court finds that Debtor's Plan protects First Union against the risk occasioned by the deferral of some interest on First Union's claim. First Union will benefit from the property improvements, which will enhance the value of the collateral by an amount greater than the amount of deferred interest. Under all these circumstances, the deferral of interest now proposed does not cause the plan to be unfair or inequitable.

4. The projections offered by debtor are reasonable and Debtor's Plan is feasible under § 1129(a)(11).

5. Debtor's Plan does not discriminate unfairly and is fair and equitable with respect to First Union's claims. Debtor's Plan satisfies all requirements for cram-down under § 1129(b) of the Bankruptcy Code.

6. The Court previously found on February 20, 1992, that First Union's objections based on debtor's classifications were overruled or moot, and those findings are incorporated herein.

7. Debtor's Plan has been proposed in good faith and not by any means forbidden by law.

8. First Union will receive under Debtor's Plan payments having a value as of the effective date equal to the full amount of First Union's claim. If debtor were liquidated as of the effective date, First Union would receive property having a value less than the full amount of its claim.

9. The Court finds that confirmation of Debtor's Plan is not likely to be followed by the liquidation or need for further financial reorganization of debtor.

10. The Court finds that debtor and Debtor's Plan meet all the requirements for confirmation set forth in 11 U.S.C. § 1129(a), except for the requirement of § 1129(a)(8) that every impaired class have accepted the plan.

11. With respect to each of the modifications of Debtor's Plan filed on October 4, 1991, January 8, 1992, January 14, 1992, and February 27, 1992, the Court finds that the effect of the modification is not materially adverse to any party that has not accepted the modification, and that there is no need for further notice or hearing or resolicitation with respect to Debtor's Plan as modified prior to confirmation.

12. Debtor's Plan provides that debtor will submit a form of modification to the wrap loan documents for the Court's approval. Debtor has five (5) days in which to submit said forms and a proposed order approving those forms.

II. First Union's Plan

13. In the Court's February 20, 1992 Order, the Court found that First Union's Plan met all the requirements for confirmation other than the separate treatment of claims in classes 6 and 7. First Union's February 27, 1992 modifications cured that problem. However, First Union's modifica-

tions changed the language pertaining to the treatment of class 3 priority and post-petition administrative claims. In First Union's Plan before the Court prior to the February 27, 1992 modification, the plan provided that class 3 claims would be paid in full on the effective date of the plan out of the debtor's unencumbered cash account and, if that account was not sufficient, then First Union would pay any remaining amounts necessary to pay those claims in full. Class 3 was not impaired. With the modifications filed on February 27, 1992 and discussed in Court on March 5, 1992, First Union's Plan set a limit on First Union's obligation to class 3 creditors at $75,-000.00. First Union's counsel explained that if administrative claims were allowed in excess of $75,000.00, then First Union's Plan would not be effective.

14. Debtor argued that the modification placing a limit on the amount required to be paid on administrative claims failed to satisfy the requirement under § 1129(a)(9)(A) of the Bankruptcy Code that a plan provide for full payment of administrative claims on the effective date, unless the claimant has otherwise agreed. First Union's counsel explained that its desire to limit its exposure grew out of a concern that debtor's limited partners would file administrative claims for funds advanced to pay legal fees during the pendency of this case. While First Union's desire to avoid paying such claims is understandable, the issue of what are proper administrative claims is not and was not before the Court. The stated limitation on the payment of administrative claims is technically not in compliance with § 1129(a)(9)(A).

15. First Union's counsel argued at the March 5, 1992 hearing that the only practical effect of limiting its exposure on administrative claims would be to delay confirmation. First Union's counsel suggested that the Court could set a bar date on administrative claims, and that if the allowed claims exceeded $75,000.00, then First Union's Plan could not be confirmed. First Union further argues that this delay would not delay consummation of its plan, since First Union could not consummate its plan until it prevails in the adversary proceeding referred to in this Court's Orders of December 9, 1991 and February 20, 1992. This case has been pending long enough, and the Court sees no reason to delay confirmation any longer, given that Debtor's Plan is now confirmable.

III.   Analysis Under § 1129(c)

16. If First Union's Plan were confirmable notwithstanding its treatment of administrative claims, then the Court would have before it two plans which met all the requirements for confirmation. In order to avoid further litigation at the trial level, the Court will address which plan should be confirmed, if both plans were confirmable under 11 U.S.C. § 1129.

17. Section 1129(c) of the Bankruptcy Code provides that the Court may confirm only one plan and that if the requirements of § 1129(a) and § 1129(b) are met with respect to more than one plan, the Court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

18. The equity security holders prefer Debtor's Plan, and the smaller creditors have expressed a slight preference in favor of Debtor's Plan. First Union prefers its own liquidation plan whereby it gets to take the property. The Bankruptcy Code gives very limited guidance on which plan to confirm when more than one plan is submitted, the equity security holders and small unsecured creditors favor one plan, and the large secured creditor favors its own plan. However, the courts have stated in numerous contexts that reorganization is preferable to liquidation and the philosophy of the Bankruptcy Code is to preserve economic units. *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal. 1982). *See also In re Consolidated Operating Partners L.P.*, 91 B.R. 113, 115–16 (Bankr.D.Colo.1988). Considering the preferences expressed by some creditors and all equity security holders and all the other facts and circumstances of this case, the Court finds that Debtor's Plan should be confirmed.

In light of the above findings and conclusions, it is hereby ordered that:

1. Debtor's Plan is hereby CONFIRMED;

2. All objections to confirmation of Debtor's Plan are hereby OVERRULED; and

3. Confirmation of First Union's Plan is hereby DENIED.

IT IS SO ORDERED.